UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO. _____

| | |
|---|---|
| Fran M. Underwood and Danny C. Underwood, Co-Administrators of the Estate of Frances Carter Underwood, Deceased,<br>          Plaintiff,<br><br>v.<br><br>SSC Clayton Operating Company LLC d/b/a Brian Center Health and Retirement/ Clayton,<br>SSC Submaster Holdings, LLC,<br>SSC Equity Holdings, LLC,<br>North Carolina Holdco, LLC,<br>SavaSeniorCare Administrative Services, LLC,<br>SavaSeniorCare, LLC,<br>SavaSeniorCare Consulting, LLC<br>          Defendants. | **COMPLAINT**<br>(Jury Trial Demanded) |

The Plaintiffs, Fran M. Underwood and Danny C. Underwood, complaining of the Defendants, alleges and says as follows:

1. Plaintiffs Fran M. Underwood and Danny C. Underwood are the Co-Administrators of the Estate of Frances Carter Underwood (also referred to as "Frances" and/or "resident" herein), as documented in Johnston County estate file number 13E606.

2. Plaintiffs Fran M. Underwood and Danny C. Underwood are citizens and residents of North Carolina.

3. Frances Carter Underwood, deceased, was a citizen and resident of Johnston County, North Carolina.

4. At all times material to this Complaint, SSC Clayton Operating Company LLC d/b/a Brian Center Health and Retirement/Clayton, was a Delaware limited liability company, organized to do business and doing business within the State of North Carolina as the licensed owner and operator of a nursing facility licensed as Brian Center Health & Retirement/Clayton in

1

Clayton, North Carolina. SSC Clayton Operating Company, LLC at all times relevant did substantial and continuous business in the State of North Carolina and may be served through its registered agent, CT Corporation System, 150 Fayetteville St., Box 1011, Raleigh, NC 27601.

5. At all times material to this Complaint, SSC Submaster Holdings, LLC was a Delaware limited liability company doing business within the State of North Carolina. SSC Submaster Holdings, LLC was involved in the ownership, operation, management and/or maintenance of the nursing facility and/or property at Brian Center Health & Retirement/Clayton in Clayton, North Carolina and did substantial and continuous business in the State of North Carolina. SSC Submaster Holdings, LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

6. At all times material to this Complaint, SSC Equity Holdings, LLC was a Delaware limited liability company doing business within the State of North Carolina. SSC Equity Holdings, LLC was involved in the ownership, operation, management and/or maintenance of the nursing facility and/or property at Brian Center Health & Retirement/Clayton in Clayton, North Carolina and did substantial and continuous business in the State of North Carolina. SSC Equity Holdings, LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

7. At all times material to this Complaint, North Carolina Holdco, LLC was a Delaware limited liability company doing business within the State of North Carolina. North Carolina Holdco, LLC was involved in the ownership, operation, management and/or maintenance of the nursing facility and/or property at Brian Center Health & Retirement/Clayton in Clayton, North Carolina and did substantial and continuous business in the State of North Carolina. North Carolina Holdco, LLC may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

8. At all times material to this Complaint, Defendants SavaSeniorCare, LLC, SavaSeniorCare Administrative Services, LLC, and SavaSeniorCare Consulting, LLC were Delaware limited liability companies doing business within the State of North Carolina. Same

were involved in the ownership, operation, management and/or maintenance of the nursing facility and/or property at Brian Center Health & Retirement/Clayton in Clayton, North Carolina and did substantial and continuous business in the State of North Carolina. Same may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

9. Jurisdiction and venue are appropriate as there is complete diversity of citizenship between Plaintiffs and Defendants as defined by 28 U.S.C. §1332(a)(1) and the amount in controversy exceeds $75,000.

10. Venue is proper in this District pursuant to 28 U.S.C. §1391 as Plaintiff resided and died in this District, and the nursing home at issue, Brian Center Health & Retirement/Clayton, operated by SSC Clayton Operating Company, LLC, where a substantial part of the events or omissions giving rise to the claim occurred is in this District.

### OBJECTION TO N.C.G.S. §90-21.19

11. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

12. Plaintiffs object to N.C.G.S. §90-21.19 (the cap on economic damages) as unconstitutional. The cap on noneconomic damages denies medical malpractice plaintiffs, including Plaintiffs herein, the right to a jury trial, due process of law, equal protection under the law, and the right to open courts, violates the separation of powers, and confers an exclusive emolument on health care providers in violation of the United States and North Carolina Constitutions. The cap on noneconomic damages violates the Seventh and Fourteen the Amendments of the United States Constitution and Article I, §§ 6, 18, 19, 25 and 32 and Article IV, §§ 1 and 13 of the North Carolina Constitution.

### FACTUAL ALLEGATIONS

13. At all times material to this complaint, Defendants acted together as a "health care provider" within the definition of N.C.G.S. §90-21.11, and operated, owned, managed or maintained the Brian Center Health & Retirement/Clayton (hereinafter referred to as "Brian Center") as a nursing home within the meaning of N.C. Gen. Stat. §131E-101 offering skilled and intermediate care in Clayton, North Carolina.

14. At all times during Frances' residency at the Brian Center, Defendants, regardless

of having separate limited liability company names, operated collectively in such a manner that their actions functioned in concert as the Brian Center with regard to the duties and breaches thereof related to Frances as discussed more fully below.

15. At all times during Frances' residency at the Brian Center, Defendants were responsible for the operation and management of the Brian Center, including its duty to comply with the requirements of N.C.G.S. Chapter 131E, Article 6 and the state regulations adopted and promulgated there under 10A NCAC Ch. 13D, and the federal regulations contained in 42 CFR Part 483.

16. At all times material to this complaint, Defendants operated the Brian Center as a skilled nursing facility participating in the Medicare program and as a nursing facility participating in the Medicaid program.

17. Defendants held the Brian Center out to the North Carolina Department of Health and Human Services, to the public at large, and to Frances Underwood and her family specifically, as being:

    a. skilled in the performance of nursing, rehabilitative, and other medical support services;

    b. properly staffed, supervised and equipped to meet the total needs of its residents, including Frances Underwood; and

    c. licensed by the North Carolina Department of Health and Human Services as complying on a continual basis with all rules, regulations, and standards established for nursing homes in North Carolina.

18. Defendants held the Brian Center out to the Centers for Medicare Services, to the public at large, and to Frances and her family specifically, as being a skilled nursing facility and as a nursing facility meeting the requirements of 42 C.F.R. Part 483.

19. In early 2013, Frances Carter Underwood was a ninety three (93) year old woman living with chronic renal failure and congestive heart failure who had a history of falls.

20. Frances lived at Meadowview Assisted Living until March 8, 2013 when she was admitted to the hospital for exacerbation of her congestive heart failure and chronic renal failure.

21. After a few days of in-patient care at the hospital, Frances was discharged and was admitted on March 12, 2013 to the Brian Center for health care.

22. On her admission to the Brian Center, an initial Fall Risk Assessment was completed by the staff, employees or contractors of the Brian Center.

23. The initial Fall Risk Assessment noted that Frances was at increased risk for falls for multiple reasons including being chair bound, having intermittent confusion, being on multiple medications and having predisposing diseases that could cause a fall.

24. Her initial Fall Risk Assessment score was 12.

25. In general, on a Fall Risk Assessment, the higher the number of fall risks, the higher the score.

26. As required by federal and state laws, an initial Plan of Care (hereafter "POC") was completed by the staff, employees or contractors of the Brian Center which indicated that Frances required assistance with her activities of daily living (ADL's) due to her dementia and other disease processes.

27. Frances' POC mandated that she required and receive extensive assist by two (2) staff members for mobility and transfers.

28. It was noted in multiple places in her medical and healthcare records at the Brian Center that Frances had the potential to fall.

29. Thus, the Brian Center was required to evaluate the steps that needed to be taken to ensure Frances' safety and, presumably, the staff; employees and contractors of the Brian Center were instructed to follow the necessary steps and its own policies and procedures to prevent an avoidable fall.

30. On March 13, 2013, an Occupational Therapy evaluation completed at the Brian Center noted that Frances presented with balance deficits, decreased dynamic balance and decreased safety awareness. Additionally, Frances had fine motor coordination deficits and strength and mobility impairments, resulting in her decline in prior level of independent bathing, dressing, toileting, transfers and wheelchair mobility.

31. Three days later, on March 16, 2013, Frances had her first documented fall at the Brian Center. She was found on the floor at 1:40 a.m. She suffered skin tears to her left elbow, left middle finger and right forearm. Frances was assisted to stand and then assisted back to bed.

32. It is documented that Frances said she was getting up to put her clothes on to get dressed.

5

33. On March 17, 2013, Frances was noted by the Brian Center to have an unsteady gait. Her call bell was to be left within her reach and, for safety measures, a ½ rail and a bed/chair alarm were documented as being used on that day.

34. That same evening, Frances complained of a headache and the Brian Center gave her Roxanol (a powerful narcotic) for complaints of a headache at 5:00 p.m. and 8:45 p.m.

35. At midnight on March 17th, the nurses' notes from the Brian Center records indicate Frances, a patient with dementia, continued to ambulate unassisted after having been administered Roxanol and attempts to redirect her were unsuccessful.

36. On March 18th, Frances was continuing to ambulate unassisted.

37. Either because of her underlying dementia, her medical condition or the medications she was administered, she was not able to keep herself safe.

38. The Brian Center, its staff, employees and contractors failed to keep Frances safe.

39. Between March 18th and 19th, the staff, employees or contractors at the Brian Center provided poor care such that Frances had a dangerous drop in her blood glucose level.

40. At 7:30 a.m. on the morning of March 19th, Frances was lethargic and not responsive to physical stimuli. Her blood glucose level was dangerously low and the staff of the Brian Center struggled to get sugar into Frances. Attempts were made to give Frances orange juice with 4 packs of sugar. Nursing notes indicate the minimal success because the resident was unable to swallow.

41. The family was called and the Director of Nursing was sent to wait at Frances' bedside. Later that day, she complained of a headache and was again given Roxanol.

42. Frances was sent to the hospital for a fever and chills. She was discharged the following day, March 20, 2013, with diagnoses of a urinary tract infection and healthcare associated right lower lobe pneumonia.

43. Frances was readmitted from the hospital back to the Brian Center with an increased Fall Risk Assessment score of 15.

44. Although Frances was readmitted on March 20, 2013 with an increased Fall Risk Assessment score, the staff, employees and contractors at the Brian Center incorrectly noted that upon readmission Frances needed <u>less</u> extensive assistance for her transfer and mobility.

45. While she had been previously documented with a Fall Risk Assessment score of

6

12 and needed extensive assistance of two people for transfers, upon readmission on March 20, 2013 with a higher Fall Risk Assessment score of 15, she was noted to need the assistance of only one staff member instead of two.

46. On March 21, 2013, Frances was again found several times attempting to get out of bed unaided.

47. At that time, no one at the Brian Center performed a proper assessment at the time, contacted her physician or family or checked her oxygen saturation.

48. On March 22nd, Frances was noted by the Brian Center to be a wanderer, which means she was not able to maintain her own safety and needed staff assistance for safety.

49. On March 23, 2013 at 5:30 a.m., the staff, employees or contractors of the Brian Center reported that Frances' alarm was sounding.

50. The staff, employees or contractors of the Brian Center reported finding Frances not just out of bed, but sitting on the floor next to her bed. This was her second documented fall.

51. At that time, immediately after Frances' second documented fall at the Brian Center, no one at the Brian Center contacted her physician.

52. The next day, March 24, 2013, the Brian Center nurses' notes indicate at 3:00 a.m. that Frances kept getting out of bed and was delirious.

53. No testing or discussion with the physician was done to investigate the possible cause of Frances' delirium.

54. The Brian Center nurses' notes indicate at 6 a.m. Frances had been confused, out of bed and took her alarm off.

55. At that time, in the face of additional evidence of Frances' inability to maintain her own safety, no one at the Brian Center contacted her physician or her family.

56. At that time, in the face of additional evidence of Frances' inability to maintain her own safety, no one at the Brian Center performed a proper assessment at the time or checked her oxygen saturation.

57. After Frances' third documented fall at the Brian Center, someone at the Brian Center made late, after-the-fact additions to the Brian Center nurses' notes to indicate Frances had been confused with delirium, was getting out of bed, not using her call bell, and re-direction had no positive effect.

58. These late, after-the-fact additions to the Brian Center nurses' notes read that Frances was to be "observed closely" by the staff of the Brian Center on March 24, 2013.

59. Without regard of the fact that Frances was supposed to have been "observed closely," sometime on the evening of March 24, 2014, Frances was allowed to get out of her bed, walk out of her room, walk into the bathroom of the room next to hers and fall.

60. Frances was found by the staff, employees, or contractors of the Brian Center lying face down on the floor of the room of another resident with blood streaming from her face, cheeks, forehead and right forearm.

61. The staff, employees or contractors of the Brian Center applied ice to her forehead and right eyebrow.

62. No other assessment was performed at that time.

63. Over an hour after she was found lying face down in a pool of blood, Frances was sent to the emergency room of the hospital.

64. This constituted her third documented fall at the Brian Center in the approximately ten days that she was a resident.

65. Frances was transferred from Johnston Medical Center to WakeMed Hospital because her injuries were beyond the treatment capabilities of Johnson.

66. Frances was diagnosed with an acute subarachnoid hematoma and a maxillary sinus fracture.

67. Frances died two days later on March 26, 2013 due to complications from the subarachnoid hemorrhage and maxillary sinus fracture from the fall at the Brian Center.

68. After the fall, an employee/contractor from the Brian Center re-enacted Frances' supposed actions of the fatal fall for her daughter, Plaintiff Fran Underwood.

69. The employee/contractor of the Brian Center told Plaintiff that her mother had been restless all night.

70. The employee/contractor of the Brian Center told Plaintiff that a nurses' aide took her mother to the bathroom a last time before the fall, but that employee/contractor of the Brian Center failed to place Frances' call bell in her reach after she was returned to her bed.

71. The employee/contractor of the Brian Center told Plaintiff that the bed alarm had not been re-attached to Frances.

72. The employee/contractor of the Brian Center told Plaintiff that the Brian Center only learned that Frances was out of bed on March 24, 2013 when they went to check on her an hour later, and found her bed empty.

73. On March 24, 2013, the bed alarm for Frances did not sound immediately before Frances' fall because it had not been properly attached.

74. The negligent and grossly negligent actions and omissions of the Defendants were a proximate cause of Frances' untimely death.

## DUTIES OF DEFENDANTS

75. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

76. As a condition of licensure, Defendants and their managerial employees and agents had the duty, at all times material to this complaint, to operate the Brian Center in compliance with 10A NCAC 13D, the regulations governing licensed nursing homes in North Carolina in effect during Frances' residency.

77. At all times material to this complaint, as a condition of participation in the Medicare and Medicaid programs, Defendants and their employees and agents had the duty, and state regulations required them, to operate the Brian Center in compliance with the regulations governing skilled nursing facilities participating in the Medicare program and nursing facilities participating in the Medicaid program, codified at 42 USC Ch. 4, Part 483.

78. At all times material to this complaint, Defendants and their employees and agents were "health care providers" as defined in N.C. Gen. Stat. § 90-21.11 and, as health care providers, owed Frances, while she was a resident at the Brian Center, the duty to:

    a. use reasonable care and diligence in the application of their knowledge and skill to her care;

    b. use their best judgment in her treatment and care;

    c. provide her with treatment and care in accordance with the standards of practice among members of the nursing profession and other medical support professions with similar training and experience situated in Salisbury, North Carolina and/or similar communities; and

    d. employ medical record-keeping practices which were in keeping with the

9

standards of practice among nursing homes situated in Salisbury, North Carolina, and/or similar communities, to ensure that care providers rely on well-organized and accurate information in assessing the needs and condition of the resident.

79. Defendants were, at all relevant times, legally responsible for the actions of its managerial employees and agents, and/or those employees they supervised, while acting within the course and scope of their employment and/or agency.

80. The Brian Center and its managerial employees and agents, owed certain duties to Frances while she was a resident at The Brian Center, including the duties to exercise reasonable care in:

   a. monitoring and overseeing the treatment which is administered by nurses and other health care providers practicing at the Brian Center;

   b. monitoring and overseeing the qualifications, competency, and compliance with their policies and the applicable standards of care of the nurses and other health care providers practicing at the Brian Center;

   c. ensuring that their health care providers use their best judgment in the treatment and care of their residents;

   d. monitoring and ensuring that documentation in Frances' medical record was accurate and reliable;

   e. providing proper treatment for Frances to help prevent falls;

   f. properly monitoring Frances, including responding to call bells and bed alarms;

   g. properly monitoring Frances' vital signs, including blood pressure, when the information indicated she was suffering from a significant change in condition; and,

   h. ensuring that their health care providers properly enter and follow physicians' orders;

81. Defendants owed Frances the duty to exercise direct management control of the Brian Center on a full-time basis, to develop and implement policies for the management and operation of the facility, and to train employees concerning those policies and their job duties.

82. Defendants had the duty to ensure that the following additional duties owed to Frances were met by their employees and/or agents:

   a. that patient services were provided in accordance with all applicable local, state

10

Case 4:14-cv-00217-F   Document 1   Filed 11/21/14   Page 10 of 18

and federal regulations and codes;

b. that patient services were provided in accordance with acceptable standards of practice applicable to health care providers providing resident services in the facility, and specifically that services provided or arranged by the defendants for Frances met professional standards of quality and were provided by qualified persons in accordance with her written plan of care;

c. that facility staff (both professional and non-professional including employees, agents, and/or independent contractors) were properly hired in sufficient numbers, screened, trained, and supervised;

d. that all staff was competent and fit to provide custodial and nursing care for the health, safety, and proper care of nursing home residents;

e. that The Brian Center had sufficient nursing staff to provide nursing and related services to attain or maintain Frances' highest practicable physical, mental and psychosocial well

f. that a comprehensive assessment of the resident's needs was promptly conducted and conducted again after a significant change in her physical or mental condition, which assessment was to be used to develop, review, and revise her comprehensive plan of care;

g. that a comprehensive care plan was developed for the resident;

h. that the resident received, and that they provided, the necessary care and services to attain or maintain the resident's highest practicable physical, mental and psychosocial well being, in accordance with the resident's comprehensive assessment and plan of care;

i. that, based on the resident's comprehensive assessment:

  i. the resident's abilities in activities of daily living not diminish unless the circumstances of her clinical condition demonstrated that diminution was unavoidable;

  ii. the resident was given the appropriate treatment and services to maintain or improve her activities of daily living; and

  iii. the resident, while unable to carry out activities of daily living, received the necessary services to maintain good nutrition,

11

grooming, and personal and oral hygiene;
j. that Defendants promoted care for the resident in a manner and in an environment that maintained or enhanced the resident's dignity and respect in full recognition of the resident's individuality;
k. that the resident received medical care that was supervised by a physician;
l. that Defendants' nurse's aides were able to demonstrate competency in skills and techniques necessary to care for the resident's needs, and that their professional staff were qualified to fulfill the facility's obligations to the residents;
m. that the facility's health care providers were able to demonstrate competency in skills and techniques necessary to care for the resident's needs;
n. that the facility's health care providers were properly supervised;
o. that physician services were available twenty–four hours a day in the event of emergencies.

## FIRST CLAIM FOR RELIEF:
### MEDICAL NEGLIGENCE

83. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

84. At all times relevant to this complaint, Defendants and their employees and agents as applicable owed Frances a duty to use reasonable care and diligence in the application of their knowledge and skill to her care.

85. At all times relevant to this complaint, Defendants and their employees and agents failed to use reasonable care and diligence in the application of their knowledge and skill to Frances' care while she was a resident at the Brian Center.

86. At all times relevant to this complaint, Defendants and their employees and agents, owed Frances a duty to use their best judgment in her treatment and care.

87. At all times relevant to this complaint, Defendants and their employees and agents failed to use their best judgment in the treatment and care of Frances while she was a patient at the Brian Center.

88. At all times relevant to this complaint, Defendants and their employees and agents owed Frances a duty to provide her with the treatment and care which was in accordance with

the standards of practice among members of the nursing profession and other health care professions with similar training and experience situated in Salisbury, North Carolina, and/or similar communities.

89. Defendants and its employees and agents failed to provide Frances treatment which was in accordance with the standards of practice among members of the nursing profession and other health care profession with similar training and experience situated in Salisbury, North Carolina, and/or similar communities at all times material to this complaint.

90. Defendants violated the standard of care prevalent in the community or similar communities at the time treatment was rendered by Defendants employees and/or agents to Frances, which constituted negligence on the part of the Defendant, said negligence being a proximate cause of the injury to and death suffered by Frances. In particular, Defendants, by and through its employees and/or agents, were negligent in one or more of the following ways:

    a. failed to notify her responsible party of significant changes in Frances' medical condition;

    b. failed to uphold Frances' and her responsible party's rights to be involved in decisions about Frances' care and treatment;

    c. failed to adequately staff, train, and supervise the employees, agents, or independent contractors to handle and provide proper nursing home care for Frances;

    d. failed to establish a proper system for the transmission of treatment information for persons involved in the care and treatment of Frances with others involved in her care;

    e. failed to adequately assess and implement a proper plan of care for Frances' nursing/health care and rehabilitative services;

    f. failed to adequately supervise the nursing and support staff to carry out the plan of care;

    g. failed to maintain clinical records that are complete, accurately documented, readily accessible and/or systematically organized;

    h. failed to properly complete a Fall Risk Assessment;

    i. failed to properly follow fall precautions;

j. failed to properly attach Frances' bed alarm;

k. failed put Frances' call bell within her reach;

l. failed to properly monitor and oversee the treatment which was administered by nurses, CNAs and other health care providers practicing at the Brian Center;

m. failed to properly monitor and oversee the qualifications, competency, and compliance with their policies and the applicable standards of care of the nurses and other health care providers practicing at the Brian Center;

n. other acts of negligence not specifically enumerated herein but to be developed and determined through further discovery in this action;

91. The breaches of the standard of care described in this claim for relief proximately caused damage to Frances as is more particularly set forth in the survival and wrongful death claims for relief which follow, which damage allegations are specifically incorporated by reference into this paragraph as if specifically set forth.

92. Plaintiffs and Plaintiffs' attorneys object to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this Rule seems to require Plaintiff to prove his case before factual discovery is even begun, this Rule denies medical malpractice Plaintiffs their rights of due process of law, of equal protection under the law, of the right to open courts, and of the right to a jury trial (in violation of the United States and North Carolina Constitutions) and, further, that Rule 9(j) is an unconstitutional violation of the following: (A) Amendment VII and Amendment XIV of the United States constitution; (B) Article I, Sections 18, 19 and 25 of the North Carolina Constitution.

93. Without waiving these objections, counsel for the Plaintiffs provides the following information to comply with the requirements of Rule 9(j). The medical care and all of the medical records pertaining to the negligence of Defendants, that are available to the Plaintiffs after reasonable inquiry, have been reviewed by one or more persons who are reasonably expected to qualify as an expert witness or witnesses under Rule 702 of the Rules of Evidence and who are willing to testify that health care provided to her did not comply with the applicable standards of care.

## SECOND CLAIM FOR RELIEF:

## ADMINISTRATIVE/CORPORATE NEGLIGENCE OF DEFENDANTS

94. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

95. Defendants breached its administrative duties to Frances by:

    a. failing to exercise ordinary care in having satisfactory systems and/or policies and procedures in place to ensure that medical record documentation was accurate and reliable;

    b. failing to ensure compliance with the systems and/or policies and procedures in place, if any, to ensure that medical record documentation was accurate and reliable;

    c. failing to exercise ordinary care in having satisfactory systems and/or policies and procedures in place to ensure that physicians' orders were followed;

    d. failing to exercise ordinary care in monitoring and overseeing the qualifications, competency, and compliance with their policies and the applicable standards of care of the nurses and other health care professionals practicing at and rendering care to Frances and other residents at the facility;

    e. failing to ensure there was an appropriate policy in place for evaluating a fall risk or performing a proper fall risk assessment and following through with proper fall precautions;

    f. failing to exercise ordinary care in monitoring and overseeing the selection, training, supervision and retention of nurses and other health care providers practicing at the facility

    g. failing to exercise ordinary care in monitoring and overseeing the compliance of all their employees and agents with safety standards the facility Defendants voluntarily agreed to abide by, including but not limited to N.C. Gen. Stat Chapter 131E, 10A N.C.A.C. 13D, 42 U.S.C. Ch. 4, Part 483;

    h. and other acts and omissions, which will be shown at the trial of this

15

matter.

96. The breaches of duties described in this claim for relief proximately caused damage to Frances as is more particularly set forth in the survival and wrongful death claims for relief which follow, which damage allegations are specifically incorporated by reference into this paragraph as if specifically set forth.

## FOURTH CLAIM FOR RELIEF:
### SURVIVAL ACTION

97. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

98. As a direct and proximate cause of the Defendants' breaches of duty and standards of care described in the foregoing and subsequent paragraphs, Frances suffered mental anguish, inconvenience, loss of capacity for enjoyment of life, loss of dignity, pain and suffering, permanent injury and disability, inconvenience, discomfort, reduced life expectancy, and other damages in excess of $75,000.00.

## FIFTH CLAIM FOR RELIEF:
### WRONGFUL DEATH

99. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

100. Frances died as a direct and proximate result of the Defendants' negligence as described above and below, as well as other acts and omissions, which will be shown at the trial of this matter.

101. The beneficiaries of the estate of Sara, pursuant to N.C. Gen. Stat. §28A-18-2, are entitled to recover for the damages therein listed, including, but not limited to:

   a. Compensation for Frances' pain and suffering
   b. Expenses for care, treatment and hospitalization incident to the injury resulting in Frances' death;
   c. Reasonable funeral expenses;
   d. The loss of society, companionship, love, comfort, guidance, kindly offices and advice of Frances to her family, in an amount in excess of $75,000.00.

WHEREFORE, Plaintiff prays the Court for the following relief:

1. That the Plaintiff, as Administrator of the Estate of Frances Carter Underwood, have and recover of the Defendants, jointly and severally, a sum in excess of $75,000.00 in compensatory damages, costs, pre- and post-judgment interest, and all other appropriate relief available in the foregoing causes of action.

2. That this matter be tried by a jury.

3. For such other and further relief as the Court may deem just and proper.

This the 21st day of November, 2014.

HENSON & FUERST, P.A.

BY: /s/ Rachel A. Fuerst_____
Rachel A. Fuerst
N.C. Bar No. 28273
rfuerst@lawmed.com
Carmaletta L. Henson
N.C. Bar No. 26494
carma@lawmed.com
Attorneys for Plaintiffs

Henson & Fuerst, P.A.
2501 Blue Ridge Road
Suite 390
Raleigh, North Carolina 27607
Telephone – 919.781.1107
Facsimile – 919.781.8048

## CERTIFICATE OF SERVICE

      I hereby certify that on November 21, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

    This the 21st day of November, 2014.

                                           /s/ Rachel A. Fuerst
                                           Rachel A. Fuerst
                                           N.C. Bar No. 28273
                                           rfuerst@lawmed.com
                                           Carmaletta L. Henson
                                           N.C. Bar No. 26494
                                           carma@lawmed.com
                                           Attorneys for Plaintiffs

                                           Henson & Fuerst, P.A.
                                           2501 Blue Ridge Road
                                           Suite 390
                                           Raleigh, North Carolina 27607
                                           Telephone – 919.781.1107
                                           Facsimile – 919.781.8048